UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

* * *

| | |
|---|---|
| TRUSTEES OF THE NEVADA RESORT ASSOCIATION – INTERNATIONAL ALLIANCE OF THEATRICAL STAGE EMPLOYEES AND MOVING PICTURE MACHINE OPERATORS OF THE UNITED STATES AND CANADA LOCAL 720 PENSION TRUST,<br><br>                                    Plaintiff,<br><br>           v.<br><br>GRASSWOOD PARTNERS, INC., et al.,<br><br>                                    Defendants. | Case No. 2:11-cv-00044-MMD-NJK<br><br>ORDER<br><br>(Plf.'s Motion for Summary Judgment – dkt. no. 77; Plf.'s Motion to Seal Motion for Summary Judgment – dkt. no. 78; Def.'s Motion for Hearing regarding Motion for Summary Judgment – dkt. no. 92) |

I.    **SUMMARY**

Before the Court are Plaintiff's Motion for Summary Judgment (dkt. no. 77), Motion for Permission to File Exhibits to Motion for Summary Judgment under Seal (dkt. no. 78), and Defendant Messner & Smith Theme/Value Investment Management, Ltd.'s ("Messner") Motion for Hearing on Plaintiff's Motion for Summary Judgment (dkt. no. 92).

II.    **BACKGROUND**

The claims in this case are premised on allegations that a pension plan's investment manager and investment consultant allegedly engaged in investments contrary to the plan's investment policy and the best interests of the plan and its beneficiaries, with the consultant wrongfully profiting from the plan's investments.  While the plan's investment manager and investment consultant offer explanations supporting their challenged conduct and allegations to create a factual dispute, the material facts are not in disputed.  Unless otherwise noted, the facts below are undisputed.

### A.    The Parties and the Investment Policy

Trustees of the Nevada Resort Association – International Alliance of Theatrical Stage Employees and Moving Picture Machine Operators of the United States and Canada Local 720 Pension Trust ("Trustees," or "IATSE") are fiduciaries of a multiemployer pension plan that provides pensions to union stagehands in Southern Nevada.  Trustees hired Messner as an investment manager in 1995.  Messner was hired to invest Trustees' Pension Plan assets in securities.[1]  Defendant Grasswood, Inc. ("Grasswood") is an investment consulting firm hired by Trustees in late 2002 to provide them with advice regarding investment policies, investment allocations, investment managers, and all other matters regarding the investment of the IATSE Pension Plan's assets. Grasswood remained the Plan's consultant until 2010.   Grasswood's fee for acting as an investment consultant for Trustees was $16,000 per year.

The IATSE Plan had in place a written investment policy establishing the guidelines for investment managers to follow in executing investments ("the Investment Policy").  The Investment Policy states, in relevant part:

> The investment managers shall use their best efforts to obtain execution of orders through responsible brokerage firms at the most favorable prices and competitive commission rates.  An Investment Manager may accept the instructions of the Trustees to place transaction orders with a particular broker-dealer firm provided such instruction is in writing and contains the Trustees' representation that such instructions are permitted by the Plan's underlying instruments, are in the interests of the Plan participants and beneficiaries, and will not result in a violation of the "prohibited transactions" provisions of ERISA.

Trustees assert, and Defendants do not dispute, that Defendants were aware of the Investment Policy.  In fact, Mr. Stevens developed the Policy, and Messner was involved in reviewing and commenting on draft investment policies, and signed the
///

---

[1]Trustees state that Messner obtained its position with the IATSE Pension Trust because Defendant Dale Stevens, a principal in Grasswood, referred the business to Messner.  Defendants assert that Stevens did not refer the business to Messner, but that Messner was included in a search that was provided to IATSE, and Messner was then hired.

portion of the IATSE Pension Plan's Investment Policy specific to Messner's investment assignment.

**B.      The Plan's Design and Execution**

**1.      Investment Procedures**

In order to understand the disputed investment plan here, the Court provides a brief summary of the investment procedures at issue.

Investment managers, like Messner, employ portfolio managers and analysts who decide what stocks they should buy or sell on behalf of their clients who use brokers to perform trades.  Trades may be done via a "directed account" if the client has directed a particular broker to be used.  When a client has not directed a manager such as Messner to always use a particular broker, Messner selects the broker.  In making that selection, Messner can work directly with the clearing broker, who completes the trade, without going through an introducing broker, whose role is to introduce a manager to a clearing broker.

When making a trade, the trader can negotiate the commission rate from anywhere between 1.5 cents to 6 cents per share.  The trader and the portfolio manager select a broker by looking at commission amounts, and at whether or not a broker has provided the manager with research.  However, some brokers are "execution only," and provide no research or other services to managers and therefore generally charge a lower commissioner rate sufficient to cover the base clearing costs.

**C.      Design and Execution of Trustees' Investment Policy**

IATSE claims that its Investment Policy had in place a "commission recapture program."  Under the program, when Messner selected a broker to buy and sell securities, if a particular broker was the best option to make a trade, Messner was meant to use that broker to make the trade because IATSE's Pension Trust would receive a refund of any "excess" commissions paid to the broker.  However, according to Trustees, Messner treated the commission recapture program as a directed brokerage account, where *all* trades were sent to Syndicated Capital ("Syndicated"), the introducing broker,

and Wedbush, Inc. ("Wedbush") as the clearing broker, even if these brokerage firms were not the best options for trading.  Further, instead of attempting to negotiate a competitive commission rate with Syndicated/Wedbush, Messner paid 6 cents per share in commission fees on every trade, without specific direction from Trustees to do so. Trustees assert that when placing a trade with Wedbush, an execution only broker, Messner only needed to offer a commission sufficient to cover the base clearing costs charged by the clearing broker.  Wedbush provided no additional research that would justify any higher commission rates.

Trustees aver that the directed brokerage program resulted in a benefit to Syndicated and Grasswood. That is, Stevens and Syndicated entered into an agreement whereby Grasswood would direct managers to make trades through Syndicated, and in exchange would be paid a portion of any recaptured commissions.  Any commission amounts above the actual costs of performing a trade would be paid 80% to Grasswood, with 20% retained by Syndicated.[2]   Importantly, neither Messner nor Grasswood disputes this fact.[3]  (*See* dkt. no. 79-2 at ¶ 83).  Trustees state that Grasswood did not inform Trustees that Grasswood or Stevens received compensation if Trustees directed their investment managers to use Syndicated for trading.  Trustees never entered into a written contract or agreement allowing Grasswood to profit in any way from the commission recapture program.

Defendants, for their part, argue that Trustees were well aware of the agreement with Syndicated and were directing investment managers and custodians to establish the appropriate accounts to set in place the commission recapture program.  Grasswood

---

[2]Grasswood informs the Court that due to Financial Industry Regulatory Authority ("FINRA") rules, recaptured net commissions had to be paid by Syndicated directly to Dale Stevens, rather than to Grasswood.  Stevens then transferred the funds to Grasswood.

[3]Trustees also state that Grasswood took additional arbitrary amounts from the Plan's commissions, based on its own valuation of what it deserved to be paid above the amount it had contracted with Trustees to receive.

claims that it retained 80% of the commission recapture fees because its annual retainer with IATSE was never increased for inflation during the seven years of service to the Trust, and that the total received by Grasswood, $28,000, is less than the market rate for investment managers for a Trust like IATSE's.  Additionally, Messner asserts that it had no knowledge of any self-dealing on Grasswood or Syndicated's behalf.

Defendants point to the development of the Investment Policy to support their assertion that the directed brokerage and benefit arrangements were known to and accepted by Trustees.  As part of its duties to the Plan, when Grasswood was retained in 2002, it was directed to audit the old commission recapture program.  This audit entailed an examination of brokerage fees to ensure that all parties involved were fairly compensated.  On December 5, 2002, former Trust Chairman Fred Davis wrote and signed a letter to Messner stating that Grasswood had been hired and would be supervising a new commission recapture program.  The letter regarding the commission recapture program directed Messner, "subject to best price and execution," to execute trades through Syndicated.  (Dkt. no. 77-5 at 58.)   Trustees claim that the IATSE Pension Plan never signed on or agreed to any contract or agreement setting forth the terms of the commission recapture program with either Syndicated or Wedbush.[4] Defendants assert that the terms of the commission recapture program from the previous investment consultant were adapted for the program established by Grasswood Partners in December 2002.

Finally, certain benefits retained from international investments form the basis for Trustees' allegations.  Trustees assert that while serving as investment consultant to Trustees, Grasswood recommended to Trustees that the Plan invest with Capital Research and Management Company ("Capital") to make international investments. Capital is a fund manager for the Europacific Fund ("Europacific").  At the November 15,

---

[4]The parties also dispute whether or not Trustees knew that Stevens was affiliated or registered with Syndicated, but do not dispute the fact that the two were affiliated.  (See dkt. no. 79-2 at ¶ 80.)

2007, Trustees' meeting, Grasswood recommended that the IATSE Plan invest in Europacific. Trustees assert that although they never authorized or agreed to it, Grasswood listed itself — specifically Dale Stevens and Syndicated — as "dealer of record" on the Europacific account.  As a result, Syndicated and Grasswood received Class A share rebates, which they kept for themselves.  Grasswood does not dispute receiving such rebates, but contends that Trustees terminated its services shortly after Grasswood introduced the Europacific fund to the Plan.

### D.    Trustees File Suit

On January 10, 2011, Trustees brought this action against all Defendants alleging breach of fiduciary duties and reversal of prohibited transactions under 29 U.S.C. § 1109 and § 1106(a).

## III.    MOTION TO SEAL

Trustees move under Federal Rule of Civil Procedure 5.2(d) to seal exhibits 29 and 36 to its Motion for Summary Judgment, informing the Court that these exhibits contain information covered by a protective order issued by the Court (*see* dkt. no. 66.) Defendants do not oppose the Motion.

The Court grants Trustees' Motion.  Exhibits 29 and 36 to the Motion for Summary Judgment will be filed under seal with the Court, in accordance with the parameters set forth in the Court's Protective Order (*see* dkt. no. 66).

## IV.    MOTIONS TO STRIKE AND/OR DISREGARD

### A.    Motion to Strike

Trustees move to strike all or part of both Messner and Grasswood's Opposition Briefs.

Under Rule 12(f) a court may strike from a pleading any redundant, immaterial, impertinent, or scandalous matter.  However, motions to strike apply only to pleadings, and courts are generally unwilling to construe the rule broadly and refuse to strike motions, briefs, objections, affidavits, or exhibits attached thereto.  *See Hrubec v. Nat'l R.R. Passenger Corp.*, 829 F. Supp. 1502, 1506 (N.D. Ill. 1993) (denying a motion to

strike a motion and its memorandum in support of that motion, holding that "[n]either of the offending items, however, constitutes a pleading."); *Bd. of Educ. of Evanston Twp. High Sch. Dist. No. 202 v. Admiral Heating & Ventilation, Inc.*, 94 F.R.D. 300, 304 (N.D. Ill. 1982) (denying a motion to strike when "the offending footnote is in a memorandum, not a pleading."). The Court therefore declines to strike the documents under Fed. R. Civ. P. 12(f). Further, for reasons stated below, the Court declines to disregard the documents, but determines that certain portions of Grasswood's Response Brief and exhibits attached thereto will not be considered.

**B.    Motion to Disregard Grasswood's Opposition or Portions Thereof**

First, Trustees argue that the Opposition violates Local Rule 7-4 because it exceeds the 30-page limit. LR 7-4 requires opposition briefs and points and authorities to be 30 pages or less, excluding exhibits. Grasswood includes two fact statements in its Opposition – one brief statement of facts, included as part of its points and authorities, and another lengthier statement of facts attached as an exhibit to its Opposition Brief. Grasswood's Opposition is 21 pages long, but includes a separate 42-page statement of facts. (Dkt. no. 79-2.) Nevada's Local Rules do not explicitly permit a separate submission of statement of facts. However, the Court agrees with Trustees that Grasswood's separate statement of facts is an attempt to avoid the page limits set by the District of Nevada's local rules. Nevertheless, the Court will not disregard the Response. Grasswood is instructed to seek leave of the Court before filing excess pages in the future. *See* LR 7-4.

Second, Trustees moves to strike the Opposition in its entirety because Grasswood's short statement of facts included in its points and authorities lacks a single citation to the record, in violation of LR 56-1. On review, Trustees is correct that Grasswood's Opposition violates LR 56-1. The Court cannot consider the statements contained therein as true, as the statements are unauthenticated without proper citations to the record. *See Orr v. Bank of Am.*, 285 F.3d 764, 773 (9th Cir. 2002). Grasswood is instructed to abide by LR 56-1 in the future. Moreover, "judges need not paw over the

1  files without assistance from the parties." *Id.* at 775 (*quoting Huey v. UPS, Inc.*, 165
2  F.3d 1084, 1085 (7th Cir. 1999) (brackets omitted)).   The statement of facts should
3  properly cite to the record so that the Court may find support for each of Grasswood's
4  assertions contained therein.  The Court accordingly does not consider the information
5  contained in the Response's statement of facts.

6       Third, Trustees assert that Grasswood's Opposition impermissibly relies on
7  inadmissible documents that were not disclosed in discovery.  (*See* dkt. no. 90-1, ex. 1.)
8  Trustees inform the Court that Grasswood attaches 10 exhibits to its Opposition, but only
9  exhibit 10 includes an item that was included in Grasswood's Initial Disclosures.
10 Trustees argue that Grasswood is precluded from using this evidence in its Opposition
11 under Federal Rule of Civil Procedure 37(c)(1).  The Court agrees, and will not consider
12 these exhibits.

13      Grasswood's violations of the local rules (or attempts to avoid the strictures of the
14 local rules) is a sanctionable offense, and will not be tolerated by this Court in the future.

15      **C.    Motion to Disregard Messner's Opposition**

16      Messner's Opposition, like Grasswood's, contains a separate statement of facts
17 which, when combined with Messner's Opposition, exceeds the page limits of Local Rule
18 7-4.  Trustees move to strike Messner's Opposition on this ground.   Messner's
19 Opposition is 17 pages.  Its "separate statement of undisputed/disputed material facts in
20 support of opposition to motion for summary judgment" is 42 pages long.  For the same
21 reasons articulated above in Part IV(B), the Court declines to disregard  the Opposition
22 or the attached statement of facts.   However, the Court agrees with Trustees that
23 Messner's separate statement of facts is an attempt to avoid the page limits set by the
24 District of Nevada's local rules.  Messner is instructed to seek leave of the Court before
25 filing excess pages in the future.  *See* LR 7-4.

26      The Court also notes that Trustees' Reply Brief exceeds the page limit
27 requirement of Local Rule 7-4.  Trustees explain that their Reply is 13 pages too long in
28 order to respond to Messner's lengthy Opposition.  Trustees did not seek or acquire the

1  Court's permission before filing a lengthy Reply Brief.  Trustees are instructed to abide

2  by the Local Rules in all further filings with this Court.[5]

3  **V.     MOTION FOR SUMMARY JUDGMENT**

4        **A.     Legal Standard**

5        The purpose of summary judgment is to avoid unnecessary trials when there is no

6  dispute as to the facts before the court.  *Nw. Motorcycle Ass'n v. U.S. Dep't of Agric.*, 18

7  F.3d 1468, 1471 (9th Cir. 1994).  Summary judgment is appropriate when the pleadings,

8  the discovery and disclosure materials on file, and any affidavits "show there is no

9  genuine issue as to any material fact and that the movant is entitled to judgment as a

10 matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986).  An issue is "genuine"

11 if there is a sufficient evidentiary basis on which a reasonable fact-finder could find for

12 the nonmoving party and a dispute is "material" if it could affect the outcome of the suit

13 under the governing law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

14 Where reasonable minds could differ on the material facts at issue, however, summary

15 judgment is not appropriate.  *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir.

16 1995).  "The amount of evidence necessary to raise a genuine issue of material fact is

17 enough 'to require a jury or judge to resolve the parties' differing versions of the truth at

18 trial.'"  *Aydin Corp. v. Loral Corp.*, 718 F.2d 897, 902 (9th Cir. 1983) (*quoting First Nat'l*

19 *Bank v. Cities Service Co.*, 391 U.S. 253, 288-89 (1968)).  In evaluating a summary

20 judgment motion, a court views all facts and draws all inferences in the light most

21 favorable to the nonmoving party. *Kaiser Cement Corp. v.  Fishbach & Moore, Inc.*, 793

22 F.2d 1100, 1103 (9th Cir. 1986).

23      The moving party bears the burden of showing that there are no genuine issues

24 of material fact. *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982).  "In

25 order to carry its burden of production, the moving party must either produce evidence

26 _____

27        [5]Trustees also argue that Messner's Opposition relies on inadmissible expert
   testimony.  The Court did not consider this testimony and therefore does not address this
28 objection.

9

1   negating an essential element of the nonmoving party's claim or defense or show that

2   the nonmoving party does not have enough evidence of an essential element to carry its

3   ultimate burden of persuasion at trial." *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210

4   F.3d 1099, 1102 (9th Cir. 2000).   Once the moving party satisfies Rule 56's

5   requirements, the burden shifts to the party resisting the motion to "set forth specific

6   facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.   The

7   nonmoving party "may not rely on denials in the pleadings but must produce specific

8   evidence, through affidavits or admissible discovery material, to show that the dispute

9   exists," *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404, 1409 (9th Cir. 1991), and "must do

10  more than simply show that there is some metaphysical doubt as to the material facts."

11  *Orr v. Bank of Am.*, 285 F.3d 764, 783 (9th Cir. 2002) (internal citations omitted).   "The

12  mere existence of a scintilla of evidence in support of the plaintiff's position will be

13  insufficient." *Anderson*, 477 U.S. at 252.

14      **B.      Statute of Limitations**

15      Both Defendants argue that the Employee Retirement Income Security Act of

16  1974's ("ERISA") statute of limitations bars Trustees' recovery.   Defendants assert that

17  ERISA's 6-year statute of limitations narrows the Court's inquiry to events that took place

18  no earlier than on or after January 12, 2005.

19      Trustees counter by arguing that Defendants have waived the statute of

20  limitations defense.   Federal Rule of Civil Procedure 8(c) requires that in response to a

21  pleading, a party must affirmatively state all affirmative defenses.   Among the affirmative

22  defenses that must be pled is a statute of limitations defense.   Fed. R. Civ. P. 8(c)(1).

23      "[A]n affirmative defense not raised by answer cannot be raised in dispositive

24  motions that are filed post-answer." *Smith-Haynie v. Dist. of Columbia*, 155 F.3d 575,

25  578 (D.C. Cir. 1998) (*citing Harris v. Sec'y, U.S. Dep't of Vet. Affairs*, 126 F.3d 339, 342

26  (D.C. Cir. 1997)).   "Since failure to raise an affirmative defense in pleadings deprives the

27  opposing party of precisely the notice that would enable it to dispute the crucial issues of

28  ///

the case on equal terms, a defendant forfeits an affirmative defense that is not pleaded in its answer or amended answer." *Id.* (quotation marks and citation omitted).

Defendant Messner did not list a statute of limitations defense in its Answer to Plaintiff's First Amended Complaint ("FAC"). Rather, it listed several other affirmative defenses, as well as the right to assert additional defenses. (Dkt. no. 54 at 22, ¶ 18.) Defendant Grasswood likewise did not list the statute of limitations in its Answer. (Dkt. no. 43.) Therefore, Defendants are precluded from raising the statute of limitations defense.

The Court next turns to the merits of Trustees' allegations. Trustees assert that (1) Messner did not properly investigate the appropriateness of the commission recapture program or seek written confirmation from Trustees about the program, and did not properly oversee Grasswood's investments; and (2) by using Syndicated/ Wedbush on all trades, Messner increased the excess commissions paid to Syndicated and Grasswood, a large portion of which those entities retained for themselves. Trustees also assert that Grasswood benefited from the commission recapture program and the rebates received from the Plan's investment in the Europacific fund. In addition, Trustees contend that Defendants breached their fiduciary duty by failing to comply and implement the Investment Policy.

### C.   Reversal of Prohibited Transactions–29 U.S.C. § 1106

Trustees assert that Defendants are liable under 29 U.S.C. § 1106 for deriving an improper monetary benefit from Trustees' investments.

A plan fiduciary must discharge its duties "solely in the interest of the participants and beneficiaries" for the "exclusive purpose of providing benefits" to them and "defraying reasonably expenses of administering the plan."[6]  29 U.S.C. § 1104(a)(1)(A).

///

---

[6]There is no dispute that both Messner and Grasswood had a fiduciary relationship with Trustees.

29 U.S.C. § 1106 states, in relevant part:

(a) Transactions between plan and party in interest
Except as provided in section 1108 of this title:
(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct  or indirect--
(A) sale or exchange, or leasing, of any property between the plan and a party in interest
. . .
(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan; []

(b) Transactions between plan and fiduciary
A fiduciary with respect to a plan shall not--
(1) deal with the assets of the plan in his own interest or for his own account,
. . .
(3) receive any consideration for his own personal account from any party dealing with such plan in connection with a transaction involving the assets of the plan

Moreover,

[29 U.S.C.] § 1106(b) thus creates a per se ERISA violation; even in the absence of bad faith, or in the presence of a fair and reasonable transaction, § 1106(b) establishes a blanket prohibition of certain acts, easily applied, in order to facilitate Congress' remedial interest in protecting employee benefit plans. In essence, a combined reading of §§ 1106 and 1108 and the relevant regulation suggests that a fiduciary, normally permitted to receive reasonable compensation for services rendered-this rule is preserved by the § 1108 exemption–may not if self-dealing is involved in the transaction securing the payment.

*Patelco Credit Union v. Sahni*, 262 F.3d 897, 911 (9th Cir. 2001) (*citing Gilliam v. Edwards*, 492 F. Supp. 1255, 1263 (D.N.J. 1980)).

The Court first notes that contrary to Trustees' assertion, there is no evidence that Messner benefited from Grasswood's arrangement with Syndicated. Messner is therefore not liable under 29 U.S.C. § 1106 under the facts presented.  The Motion for Summary Judgment on this claim as to Defendant Messner is accordingly denied.[7]

///

---

[7] Moreover, Trustees do not have a viable cause of action under 29 U.S.C. § 1106 against Messner for its failure to act as Grasswood's gatekeeper.  A fiduciary's failure to act does not form the basis for a prohibited transaction under the statute. *Tibble v. Edison Int'l*, 639 F. Supp. 2d 1122, 1127 (C.D. Cal. 2009).

Grasswood does not deny that any commission amounts above the actual costs of performing a trade were paid 80% to Grasswood, and 20% retained by Syndicated. However, Grasswood argues that the benefit it retained from the investments with Syndicated/Wedbush does not violate 29 U.S.C. § 1106 for three reasons: (1) the directed brokerage agreement was similar to a prior agreement between Trustees and Wurts and Associates; (2) Trustees knew about and implicitly endorsed the arrangement between Grasswood and Syndicated; and (3) Grasswood was permitted to retain a benefit under 28 U.S.C. § 1108(c). Point one is entirely without merit. Merely because there may have been a prior agreement, legal or not, between Trustees and its former investment consultant has no bearing on the legality of the arrangement between Trustees and Grasswood. To the extent Grasswood argues that the prior agreement was requested by Trustees, this assertion is related to point two – Grasswood's argument that Trustees requested and implicitly endorsed Grasswood's benefit. This argument is deeply flawed, both factually and legally. First, there is no evidence that Trustees' Investment Policy was a directed brokerage agreement, as Grasswood asserts. Grasswood presents the evidence of Chairman Fred Davis' letter, which states that "subject to best price and execution," Grasswood would be supervising a commission recapture program through its broker-dealer, Syndicated. (Dkt. no. 77-5 at 58.) Contrary to both Defendants' assertions, this is not an implicit endorsement of a directed brokerage program, because Davis stated that Grasswood was to execute trades *subject to best price and execution* with Syndicated, and the record clearly demonstrates that 6 cents per trade was not consistently the best price and execution, nor do Defendants seriously contest this point. Even were the Davis letter construed as an implicit endorsement of a directed-brokerage investment plan contrary to the plain language of the Policy, the Plan's Investment Policy, which Grasswood helped formulate, is clear that only the Board of Trustees can amend the Policy; nowhere does the Policy state that a rogue board member may unilaterally modify the Investment Policy. (*See* dkt. no. 77-2 at 98.)

13

More importantly for the purposes of 29 U.S.C. § 1106, Grasswood can point to no evidence demonstrating that Trustees explicitly or implicitly endorsed Grasswood retaining 80% of the excess commissions garnered through its investments on the Plan's behalf. The fact that Trustees may have known about the benefit program due to quarterly letters provided to the Plan President also does not suffice to defeat summary judgment here. *See Patelco*, 262 F.3d at 911 ("even in the absence of bad faith, or in the presence of a fair and reasonable transaction . . . a fiduciary[] . . . may not [receive reasonable compensation for services rendered if] self-dealing is involved in the transaction securing the payment."). The law is clear: a pension plan fiduciary cannot benefit from plan investments. 29 U.S.C. § 1106; *Patelco*, 262 F.3d at 910-911. No proviso is made for instances where the Plan may have been informed about said self-dealing.

For reasons intimated above, to the extent Grasswood argues that the benefit it retained is excused under 29 U.S.C. § 1108(c), this argument fails. 29 U.S.C. § 1108(c) applies only to self-dealing transactions with parties-in-interest, not self-dealing transactions benefiting fiduciaries, and therefore, while the statute may exempt Syndicated from liability, the same cannot be said of Grasswood. *Patelco*, 262 F.3d at 910, 911.

As to the claim that Grasswood benefited from the Plan's investment in the Europacific fund, Grasswood does not dispute that it obtained Class A share rebates on the Europacific investment; it only disputes the duration of its role as the investment consultant in recommending the Europacific investment. However, the timing of when Grasswood's services were terminated may affect the damages, not liability. Grasswood undeniably benefited from the plan investment in the Europacific fund in that Grasswood received the Class A share rebates.

The facts are undisputed that Grasswood acted as the Plan's fiduciary, and benefited from Plan investments. The Court accordingly grants Trustees' Motion for Summary Judgment on this claim as to Defendant Grasswood.

1

2

**D.    Breach of Fiduciary Duty**

      **1.    Messner**

3

4

5

6

7

8

9

The Court agrees with Trustees that Messner breached its fiduciary duty by allowing Grasswood to commit a breach of its fiduciary duty and obtain a benefit from the Plan's investments, by not seeking the best brokerage commissions with a competent broker, and by overpaying commission rates above the reasonable rate.  Messner does not provide evidence rebutting Trustees' factual assertions regarding these actions; and such actions clearly breach the Plan's terms, which state that "investments shall be chosen to maximize the return on invested assets."  (Dkt. no. 77-2 at 95.)

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

As discussed above in Part (V)(C), the plain terms of the Investment Policy prohibit directed brokerage.  The Plan states: "[t]he Investment Managers shall use their best efforts to obtain execution of orders through responsible brokerage firm<u>s</u> at the most favorable prices and competitive commission rates."  (Dkt. no. 77-2 at 96; emphasis added).  The plural noun, firm<u>s</u>, clearly precludes the use of a directed brokerage account.  Further, while the Court determines that the Fred Davis letter does not request a directed brokerage investment plan, were there evidence that anyone associated with Trustees had requested such a plan, it would be immaterial here. Messner owes a duty of care to the *Plan*, and must execute investments according to the Plan's best wishes, not the whims of the Trustees' members.  *See* 29 U.S.C. § 1104(a)(1)(A)(i).  There is no dispute that Messner was involved in the development of the Investment Policy, and understood its terms.  As such, Messner understood that only the Board of Trustees, not a single board member, had the right to amend the Investment Policy.  (*See* dkt. no. 77-2 at 98.)  Thus, disregarding the plain terms of the Plan and allowing Grasswood to benefit from Plan investments is a clear breach of Messner's fiduciary duty owed to Trustees.  *See id.*; 29 U.S.C. §§ 1104(a)(1)(B),(D) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and . . . in accordance with the documents and instruments governing the plan . . . .").

### 2.    Grasswood

For reasons stated above in Part (V)(D)(1), Grasswood likewise breached its fiduciary duties to Trustees by acting in contravention to the Plan's plain terms, by obtaining a benefit from the commission recapture program and by failing to supervise the commission recapture program pursuant to the Investment Policy.[8]

## VI.    DAMAGES

The Court's rulings affect Trustees' Motion with respect to damages.  Moreover, the Court determines that a separate hearing regarding the proper calculation of damages is necessary.  A hearing on the matter will be scheduled by the Court via minute order in the coming weeks.

## VII.    CONCLUSION

The Court notes that the parties made several arguments and cited to several cases not discussed above.  The Court has reviewed these arguments and cases and determines that they do not warrant discussion as they do not affect the outcome of the Motions.

IT IS THEREFORE ORDERED THAT Plaintiff's Motion for Summary Judgment (dkt. no. 77) is GRANTED IN PART.  The Court GRANTS the Motion on the question of Defendants' Messner and Grasswood's liability to the following extent:

- The Motion is DENIED on Plaintiff's 29 U.S.C. § 1106 claim against Defendant Messner;
- The Motion is GRANTED on Plaintiff's 29 U.S.C. § 1106 claim against Defendant Grasswood;
- The Motion is GRANTED on Plaintiff's breach of ERISA fiduciary duties claims against Defendants Messner and Grasswood.
- The Court withholds judgment on the issue of damages.

---

[8]The evidence is clear that Grasswood, like Messner, was involved in the development of the Investment Policy and understood that only the Board of Trustees could modify the Investment Policy.

1        IT IS FURTHER ORDERED that Plaintiff's Motion to Seal (dkt. no. 78) is

2  GRANTED.

3        IT IS FURTHER ORDERED that Defendant Messner's Motion for a Hearing

4  regarding Plaintiff's Motion for Summary Judgment (dkt. no. 92) is GRANTED.   The

5  Court will schedule a hearing regarding damages.

6

7        ENTERED THIS   27th day of March 2013.

8

9                                                    _____

10                                                   MIRANDA M. DU
                                                     UNITED STATES DISTRICT JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28